MARY A. READ, PLAINTIFF IN ERROR, v. THE CITY OF CAMDEN AND THE PENNSYLVANIA RAILROAD COMPANY, DEFENDANTS IN ERROR.

| 54 | 347 |
| 57 | 298 |
| 57 | 524 |
| 54 | 347 |
| 61 | 593 |
| 54 | 347 |
| 64 | 590 |

1. An abutting owner can maintain a *certiorari* to review an ordinance changing the grade of a street in front of his property, and if the change of grade is justified only as part of an entire scheme he may question the legality of the scheme.

2. Under the act of March 19th, 1874 (*Rev.*, p. 944), municipal authorities may, in furtherance of the object there contemplated, vacate any street, or any part of a street, and change the grade upon any street or part of a street without the consent of abutting owners.

3. Under that act municipal authorities may also construct bridges as parts of streets, to carry the public way above intersecting railroads.

4. If an ordinance, which is intended to change the grade of a street so as to carry the way over an intersecting railroad by means of a bridge and approaches, contains a clause vacating a part of the street on which the approach is to rest, it thereby defeats its main object, and it will be set aside as unreasonable.

On error to the Supreme Court. For opinion of Supreme Court, see 24 *Vroom* 322.

For the plaintiff in error, *Thomas E. French.*

The prosecutor owns lots on the west side of Second street, south of Bridge avenue, in the city of Camden. Edward Sharp, April 10th, 1820, laid out a plot called Camden Village Continuation, including therein Bridge avenue and Second street at their intersection, and Second north to Federal street, and Bridge avenue west of Fourth street. Plan was recorded in office of clerk of Gloucester county July 3d, 1820. Edward Sharp and wife, by deed of September 28th, 1820, conveyed to James Read a lot in said town plot, on the west side of Queen, now Second, street, " together with the free use of all the public streets and alleys, as laid out in the said town plot of Camden Continued." The deed was recorded May 6th, 1821. James Read was the father of prosecutor's husband. By *Exhibits 4, 5* and *6* the title became vested in prosecutor.

Camden city became incorporated by an act approved March 6th, 1828. *Pamph L.*, p. 193. Said Second street and Bridge avenue became streets of said city.

The Camden and Amboy Railroad and Transportation Company was incorporated in 1830.

The city of Camden, on September 26th, 1889, passed an ordinance entitled "An ordinance to change the lines and grades of Bridge avenue from Second street to Fourth street, and Second street from Federal street to Stevens street, and

to vacate a portion thereof, and to authorize the construction of a bridge across Bridge avenue at Second street."

Section 1 of the ordinance intended to change the lines and grades of Second street from Federal to Stevens street, Bridge avenue from Fourth street westward, and Taylor avenue from Front to Second street.

Section 2 of the ordinance intends to vacate—

1. Bridge avenue west of Fourth street and north of a line forty feet north from the south house-line of Bridge avenue.

2. Second street from a point in the north line of Bridge avenue as vacated to a point two hundred and twenty-two and a half feet south of south line of Federal street.

Section 3 authorized the Pennsylvania Railroad Company to construct an iron bridge, with necessary approaches, over Bridge avenue, " using the western half of said Second street for that purpose," and also authorized, empowered and directed said railroad company " to move its tracks, now on Bridge avenue west of Fourth street, to and upon that part of Bridge avenue hereby vacated."

On May 29th, 1890, commissioners were appointed to assess damages on Second street from Federal street to Stevens street, for the land now used as a highway, required for a highway on the grade established by said ordinance. The commissioners were directed to meet June 5th. Afterwards the time of meeting was changed to July 18th. The commissioners met and awarded damages September 3d, 1890. The rule for *certiorari* was returnable July 5th, and the rule allowing the writ July 10th, 1890, and the writ issued and served July 10th, 1890.

The writ brings up the ordinance, and also the condemnation proceedings carried on by the city under color of said ordinance, to take that part of prosecutor's land which is in Second street, between the middle of the street and the house line, for the southern approach to an abutment of the bridge.

Second street in front of prosecutor's lands has not been vacated.

I. As to jurisdiction. The prosecutor is specially injured, her private way in the streets is taken and the abutment of the bridge shuts off her access to her property.

Also, it is attempting to take her land by a statutory tribunal without jurisdiction.

II. The condemnation proceedings were carried on after the allowance of the writ of *certiorari,* which was upon a rule to show cause and argument thereon. Proceedings subsequent to the *certiorari* are absolutely void.

The *certiorari* operated as a *supersedeas. McWilliams* v. *King,* 3 *Vroom* 21, 25; *Hunt* v. *Lambertville,* 17 *Id.* 59, 60.

The condemnation proceedings propose to take for a street what is already a street by dedication and acceptance.

· III. The city council has no power to pass said ordinance.

It vacates sixty feet of Bridge avenue from Fourth street westward, and authorizes the Pennsylvania Railroad Company to put all of its tracks on the part so vacated; in other words, to use it for terminal purposes.

It vacates a part of Second street between Bridge avenue and Federal street of the whole width of Second street, and authorizes the construction by the Pennsylvania Railroad Company of a bridge across Bridge avenue on the west half of Second street, part of which will be on the part vacated.

It authorizes the bridge to be built on prosecutor's lands in Second street, blocking up the entrance to her houses.

The streets were dedicated by Edward Sharp in 1820, by maps filed and recorded.

The effect of that was to give to the public at once a way over the lands, a privilege of using them according to the effect of the dedication, but the public were not bound to open or emend until formal acceptance by corporate act or continued user. The dedication being full and unequivocal, neither Edward Sharp nor his heirs or assigns could retract. The easement of the public is frequently called a perpetual right of way, and this before acceptance.

When it is accepted, then, the public is bound to open, or, if opened, to emend. *Trustees* v. *Hoboken,* 4 *Vroom* 13, 19, 22;

*Hoboken Land and Improvement Co.* v. *Hoboken,* 7 *Id.* 540, 545, 549; *Jersey City* v. *Morris Canal,* 1 *Beas.* 553, 554; *In re Lewis Street,* 2 *Wend.* 472, 475; *Bissell* v. *The New York Central R. R. Co.,* 23 *N. Y.* 61, 64; *Livingston* v. *Mayor, &c., of New York,* 8 *Wend.* 85; *Wyman* v. *Mayor, &c., of New York,* 11 *Id.* 487; *Ang. High.,* § 139 and cases.

The right is to have the way remain open the full extent of its dimensions. *White* v. *Flannigan,* 1 *Md.* 525, 540, and cases cited.

The grant to prosecutor gave her the free use of Bridge avenue and Second street as ways appurtenant to her lot; this grant gave her as well the way over the street on which her lot abutted as over the other streets and avenues of said plan, and this way, which is called a private right of way in the Booraem case, was wholly distinct from and independent of the right of passage of the public, and for which it is to be presumed she paid an advanced price over the price of her land without the ways. *Booraem* v. *North Hudson Co. R. R. Co.,* 13 *Stew. Eq.* 557, 564; *Clark* v. *Elizabeth,* 11 *Vroom* 172, 175; *Hammond* v. *McLachlan,* 1 *Sandf.* 323, 343.

This latter case, approved in *Bissell* v. *New York Central R. R. Co.,* 23 *N. Y.* 63, 68, speaks of it as a private way, and questions municipal corporation's power to close it by vacation.

The prosecutor also has, as an abutting owner, the right of access, light and air, and, in common with the public, the right to free and unobstructed passage. These rights are property. *Keokuk's Case,* 94 *U. S.* 324; *Lohr* v. *Metropolitan Elevated R. R. Co.,* 104 *N. Y.* 268.

The city of Camden, the local corporate authorities, accepted these streets.

It cannot release or discharge the public right unless authorized to do so by legislative authority, or apply the lands to a purpose different from the uses for which the dedication was made. *Hoboken Co.* v. *Hoboken,* 7 *Vroom* 549.

" Public highways ought not to be destroyed, even in part, under pretence of legislative authority, unless it be conferred

either in express terms or by necessary implication. If the words are ambiguous, the construction ought to be in favor of the common right of highway, not against it." *Morris and Essex R. R. Co.* v. *Newark*, 2 *Stockt.* 352, 363; *Warren R. R. Co.* ads. *State*, 5 *Dutcher* 354, cited by Van Fleet, V. C., in *Jersey City* v. *Central R. R. Co.*, 13 *Stew. Eq.* 419. And it is observable if, upon the return of an *ad quod damnum*, it appear to be *ad damnum vel prejudicium* of no man, the king may then license the shutting up of an ancient highway, or part of it, for the concern is then wholly his own, but without his license it may never be done, though a better way be set out and so returned upon an *ad quod damnum*. *Thomas* v. *Sorrell, Vaugh.* 330, 341.

The power given to the city of Camden over these dedicated highways is solely to control the use; it does not extend either to vacation, change of grade, or authorization of obstructions.

The authority is particularly to prevent and remove obstructions and encumbrances.

The power conferred by the legislature of the State of New Jersey upon the city of Camden in respect to streets is, under revised charter (*Pamph. L.*, 1871, *p.* 210), as follows:

1. To lay out and open any street, road or highway in any part of the said city, and to cause any street, road, highway or alley already laid out in any part of the said city to be vacated, opened, altered or widened whenever and so often as they shall judge the public good requires the same to be done. Section 79, page 250.

2. To ascertain and establish boundaries, regulate, clean and keep in repair, prevent and remove obstructions and encumbrances and prevent or regulate erection of stoops and other projections. Subdivisions VI., VII. and X. of section 30, page 225.

3. To widen, level, grade, flag or reflag, curb or recurb, gutter or regutter, pave or repave, macadamize or gravel the streets, &c. Subdivision VIII. of section 30, page 226.

The general power to regulate, &c., with other powers usually granted, gives authority to keep the streets free from

obstruction and to prevent improper use. 2 *Dill. Mun. Corp.* (*4th ed.*), § 680.

The powers are those of a trustee for the benefit of the *cestui que trust* (the public), liberally construed for its benefit, strictly construed to its detriment.

The power to alter (change the course of) and to widen does not include the power to narrow.

The power "to cause any street, road, highway or alley already laid out to be vacated, opened, altered, widened," clearly gives the power only over those streets and roads laid out by proper authority, and not to those streets dedicated to the public use by the owner of the land, and the easement of way given by the owner and accepted and held by the municipal corporation in trust for the public, to be kept open, free and unobstructed under the powers contained in its charter.

The power to vacate dedicated roads not yet constructed or accepted was held did not exist under the Road act (*Holmes* v. *Jersey City*, 1 *Beas.* 307), and has since been given to surveyors of the highways over such streets and roads, except in cities having such power over such streets by act of 1885. *Rev. Sup.*, *p.* 872, § 4.

The power in the city of Camden is to lay out and open streets, defining the proceedings to be taken to lay them out and to vacate those that are laid out.

Bridge avenue and Second street (then Queen street) having been dedicated before the charter as public streets, and afterwards accepted by the public as such, there exists no power in the city to vacate them.

There has always been a distinction made between dedicated streets and those laid out by the proper authority. In the former the grant or dedication is made for public use forever as public streets, with implied covenant on the part of the dedicator with his grantees of lots on the plot that they shall be forever public streets. The municipality pays nothing for them; purchasers of lots pay the enhanced price by reason of the streets, and are entitled to have them always open. The city cannot close them; it has not the power. The abutting

owner cannot, as against the dedication, because of his deed and covenant; he must be either the dedicator or his successor in the title.

Much less can the city vacate parts, as a strip sixty feet in width, longitudinally, on Bridge avenue, or a part out of the whole width, as Second street between Bridge avenue and Federal street.

As there may be an irrevocable dedication without power to retract, and the municipal authorities not bound to open or emend, it follows that the effect of vacating a dedicated street, if there be power to vacate said streets, must be only to relieve the public from the burden of maintaining them.

This must follow from the case of Booraem *v.* North Hudson County Railroad Company.

Could the person making the dedication maintain an action of trespass against a stranger for walking on the way after unequivocal dedication before formal acceptance by the public? If so, dedications are accepted by continual user in the way of repeated trespasses.

The city council has no power to authorize the railroad company "to move its tracks, now on Bridge avenue west of Fourth street, to and upon the part of Bridge avenue hereby vacated."

It has no power to take prosecutor's way in Bridge avenue and hand it over to the railroad company. Nor has the city council of the city of Camden power to authorize any railroad company to occupy any street longitudinally.

The power is "to regulate the speed and running of locomotive engines and railroad cars through the said city and designate the crossings at which any railroad company shall be required," &c. *Rev. Char.*, ¶ XI., § 30.

The charter of the Camden and Amboy Railroad Company does no more than authorize the construction of the road across the streets and roads. *Morris and Essex R. R. Co.* v. *Newark*, 2 *Stockt.* 352, 360; *The State, Jersey City*, v. *Montclair R. R. Co.*, 6 *Vroom* 328.

The ordinance brought up is not controlling the streets or keeping them open and unobstructed, but giving sixty feet of

Bridge avenue, including the property of prosecutor there, to the exclusive use of the railway company.

As to Second street the argument is the same.

The bridge in question does not carry Second street over the railroad. Second street remains where it is, with a bridge to be built and owned by the railroad company on half of it.

If the vacation of the part of Second street is effective, and the bridge is the street, the public could have no right to use that part of the bridge which is on the vacated part of Second street.

It is the same if you attempt to call it a change of grade—the street is vacated, there is no street to grade.

The powers conferred on the city of Camden are to keep the street open for public use. The city cannot authorize any person to build on or obstruct a street, nor can it bargain or barter away the streets. It may restrain the railroad company, not the public. *Dill. Mun. Corp.*, §§ 97, 713; *Attorney General* v. *Heishon*, 3 *C. E. Gr.* 410, 411; *State* v. *Laverack*, 5 *Vroom* 201.

Other cases considering rights of parties in streets are: *Newark* v. *D., L. & W. R. R. Co.*, 15 *Stew. Eq.* 196; *Stevenson* v. *Chattanooga*, 20 *Fed. Rep.* 587; *L. Clerq* v. *Trustees of Gallipolis*, 28 *Am. Dec.* 641; *Glasgow* v. *St. Louis*, 87 *Mo.* 678; *Dubach* v. *Hannibal, &c., R. R.*, 89 *Mo.* 483; *Warren* v. *Lyons*, 22 *Iowa* 351; *Indianapolis, &c., R. R.* v. *State*, 37 *Ind.* 489; *Portland, &c., R. R.* v. *Portland*, 14 *Oreg.* 188; *Winchester* v. *Capron*, 63 *N. H.* 605; *Re John and Cherry Streets*, 19 *Wend.* 659, 675.

The ordinance as to Second street is attempted to be justified on the ground that it is a change of grade of Second street.

By reference to the plan, and the ordinance and plan of the proposed bridge at the southeast corner of Second street and Bridge avenue, when the bridge is constructed, one-half of Second street will be seventeen feet higher than the other, and if a person wished to step from the west side of Second street to go on Bridge avenue, he would go down seventeen feet.

I do not understand this to be grading a street within the usual acceptation of the word grade.

If it is, it is a change of grade and not within the power of the city, the grade being once established.

Power is (subdivision VIII. of section 30) to widen, level, grade, flag or reflag, gutter or regutter, pave or repave, macadamize or gravel the streets.

If it had the power it could only do it "by consent of majority in interest of the lots fronting on the part proposed to be altered." *Rev., p.* 1009, § 73. This statute for the benefit of persons who have built at the grade furnished by the city, peremptorily provides that "the grade of no street in any city or town which has been built on shall be altered" unless by such consent.

The court below held that, as the amended charter, 1871, and the act of 1874 (*Rev., p.* 944, § 163), were subsequent to the act of 1858, when construed together they constitute an exception to the general law relating to the grading of streets in cities.

The act of 1858 is entitled "An act to define the rights of parties whose property is damaged or taken for public use in case of the alteration of the grade of streets or highways," and was certainly for the purpose of settling the question that parties injured by change of grade should be compensated, and that in no case should the grade of streets built upon be changed without consent of majority of owners in interests of lots fronting on part proposed to be changed.

The legislature, by the revised charter, did not give the city of Camden power to change the grade of any street unless by implication, and certainly gave Camden its powers subject to the general law of 1858.

The act of 1874, if applicable to this case, which I deny, goes no further than to authorize cities to make contracts with railroad companies, whereby the companies may relocate, change or elevate their railroads, and for that purpose to change the grade of any street or highway. It does not repeal the act of 1858, either in terms or by implication; streets are

public property; abutters have distinct rights; a railroad company is practically a citizen; the authority to change the grade must be with the consent of persons named in act of 1858. To hold otherwise would be to hold that the act of 1874 repealed the act of 1858 by implication when there was no necessity for it. If the legislature meant to repeal the act of 1858, they would have expressed some intent. *Suth. Stat. Const.* 137, 138.

The court must give effect to the previous statute so far as it is not in conflict with the subsequent ones. *McCartin* v. *McCartin*, 18 *Stew. Eq.* 265, 267.

The power to change the grade is not power to use half of the street for a bridge.

The act of 1874 is not applicable; it applies only to cases where the railroad companies relocate, change or elevate their railroads. In this case no such thing is accomplished. The company depresses its tracks three feet; that is not relocating them, nor is it elevating them, nor is it making any change in them similar to a relocation or elevation.

The legislature meant to have the railroad company avoid grade crossings. In the case in hand it is attempted to give the railroad company for terminal a strip of land over which the public has rights and prosecutor a way, and compel the public to use as a way a steep bridge of the railroad company, thirty-three feet wide on one-half of Second street and thirty-three feet at grade on the other half of Second street, in order that the railroad company may enjoy its gift from the city authorities.

Can this in any sense be considered a proper action by a municipal trustee if it had the power?

The case of *Slack* v. *City of East St. Louis*, 85 *Ill.* 377, is in reference to an approach to a bridge, and holds that the city cannot obstruct streets or deprive the public and adjacent property owners from their use as streets.

The approaches to a bridge are part of the bridge and not the street or road. *Freeholders* v. *Strader*, 3 *Harr.* 108.

The power of the municipality over streets is to be exer-

cised for the public good, to keep them open, free and clear
for all, not to obstruct or render less free from passage.   While
it has power to regulate and make travel safe over the street
by restraining the railroad company as to speed, drilling, &c.,
it has no power to impede the public in its use of the street to
save the railroad company the expense of going above or
below grade, or to take away from the public its right in the
street and give the right to the exclusive use of the railroad
company, particularly when that use is not the use to which
the street was dedicated and not necessary for the public, as
telephone, telegraph, gas, water, &c.   *Dill.* (*4th ed.*), §§ 657,
660, 663, 917.

IV.  The condemnation proceedings are irregular.

The steps necessary to be taken to condemn are under section 79 of the charter of 1871.

There appears to be no notice of intention to take.

No proof of the advertisement or service of notice which
must be required before commissioners can act.

And the time appointed for meeting was made three times—
first, to meet June 5th, then June 25th, then the proceedings
were abandoned and July 18th fixed as the time of meeting.

I submit the judgment below should be reversed, and the
ordinance and proceedings to condemn vacated.

For the defendants in error, *Samuel H. Grey.*

This *certiorari* removed into the Supreme Court an ordinance passed by the city council of Camden, September 26th,
1889, entitled "An ordinance to change the line and grade of
Bridge avenue from Second to Fourth street, and Second street
from Federal to Stevens street, and to vacate a portion thereof,
and to authorize the construction of a bridge across Bridge
avenue at Second street."

The provisions of the ordinance are in conformity with its
title.

It also removed the proceedings taken by the city council
under the ordinance to ascertain the damages which the prose-

cutor would sustain by the construction of the bridge in question.

The prosecutor insists that the city does not possess the power to do what the ordinance is designed to accomplish, and that the proceedings to ascertain damages are wrong, because they evidence an attempt to condemn for a highway land which is already a highway. The prosecutor appears as a taxpayer to challenge the action of the city, and as an abutting owner of land on Second street.

I. So far as the prosecutor stands here as a taxpayer only, her right to invoke the aid of this court may well be challenged, because, unless the action of council, of which she complains, will result in an expenditure of public money, to the accumulation of which she, as a taxpayer, contributes, she would have no *status*.

Clearly as a taxpayer she is in no peril of misappropriation of public money, for the reason that the ordinance provides that the damages resulting from the action of council, if any, shall be paid by the Pennsylvania Railroad Company, and that payment has been secured not only by an agreement between that company and the city, as required by section 7 of the ordinance, but by a bond of the company for $100,000, as required by section 4.

As this agreement and this bond fully protect the city treasury, no taxpayer is in peril of a misapplication or wasteful use of public money. None will be expended. The treasury of the city is not at all involved. *Middleton,* v. *Robbins,* 24 *Vroom* 555.

Has Mrs. Read, as a property owner, any better *status?*

The bridge is designed to be built wholly within the lines of Second street, as that street has been used and recognized for at least fifty years. The land covered by Second street is dedicated to the use of the public as a street. It is a way common to all persons who have occasion, in any manner, to use it in passing. Hence any use of it may be made by the city authority, which has "exclusive control" over all streets (Charter, § 76), consistent with the public enjoyment of the

public way. The methods in which such enjoyment may be best secured are in the discretion of council, inasmuch as the power to "control" streets is "exclusive" in council. An application of the land dedicated to the public as a street may be made without compensation to the abutting owner. *Pope* v. *Union,* 3 *C. E. Gr.* 282; *Dodge* v. *Pennsylvania R. R. Co.,* 16 *Stew. Eq.* 351; *affirmed,* 18 *Id.* 366; *Clarke* v. *Elizabeth,* 11 *Vroom* 172; *Stoudinger* v. *Newark,* 1 *Stew. Eq.* 187.

A street may be used in any way which shall best promote the interest and business of the city. What will so promote those interests and business is to be determined by the municipal authorities to whom the control of streets is committed. *Chapman* v. *Albany, &c., R. R. Co.,* 10 *Barb.* 360; *Milhau* v. *Sharp,* 15 *Id.* 210; *Stoudinger* v. *Newark, supra.*

In recognition of the doctrine above indicated, horse railroads, as an additional facility to the public use of a street, have been recognized as legitimate uses of public streets. *Hinchman* v. *Paterson, &c., R. R. Co.,* 2 *C. E. Gr.* 75; *Paterson and Passaic Ry. Co.* v. *City of Paterson,* 9 *Id.* 158.

The use last recognized as legitimate, it will be observed, is given to a private corporation as a source of profit; how much the more does the use here intended partake of a purely public character. We propose, without expense to the city or its citizens, to make public travel secure; to remove impediments to its free and uninterrupted course; to increase, not to diminish, the easy and rapid movement of the public over a public street.

The use, then, to which the soil of the street will be applied, after the construction of the bridge, being a public one, how can Mrs. Read, whose lands are dedicated to such use, complain?

"With regard to all lands over which streets have been laid, the ownership, for all substantial purposes, is in the public. Nothing remains in the original proprietor but the naked fee, which, on the assertion of the public right, is divested of all beneficial interest." *Hoboken Land and Improvement Co.* v. *Hoboken,* 7 *Vroom* 551.

Yet she has been awarded ample damages, and her challenge of the city power to authorize the bridge is an admission that if the power exists it has been exercised under circumstances which subject her to no greater pecuniary loss than is amply compensated by the damages awarded.

The proposed bridge being part of the street, when constructed, and being wholly within the lines of the street, and, when completed, being the street itself, the original dedication of the land to public use as a street is fully subserved by the bridge.

A bridge is part of the highway in which it is built. *Whitall* v. *Gloucester*, 11 *Vroom* 302; *Central R. R. Co.* v. *State*, 3 *Id.* 220; *Newark* v. *Delaware, Lackawanna and Western R. R. Co.*, 15 *Stew. Eq.* 196; *Jersey City* v. *Central R. R. Co.*, 13 *Id.* 417; *McKinley* v. *Freeholders*, 2 *Id.* 164; *Mullarkey* v. *Cedar Falls*, 19 *Iowa* 21, 24; *Dively* v. *Cedar Falls*, 27 *Id.* 227; *Chicago* v. *Powers, Admx.*, 42 *Ill.* 169.

That a bridge is not necessarily a structure to carry a way over a stream may be seen by reference to New Jersey legislation and authority. *Rev., tit. "Railroads," p.* 929, § 102. In *Freeholders of Sussex* v. *Strader*, 3 *Harr.* 108, Judge Dayton (at *p.* 112) describes a bridge as a " passageway    *    *    * over stream or *other obstruction.*" A way across a railroad to carry a public road has been regarded as a bridge. *Baylor* v. *Delaware, Lackawanna and Western R. R. Co.*, 11 *Vroom* 25; *New York and Greenwood Lake R. R. Co.* v. *State*, 21 *Id.* 303; *Whitall* v. *Gloucester, supra.*

A bridge is an essential part of the highway, and the erection of the bridge is but the laying out of the highway. *Elliott Streets* 21–23.

The case of *Ballantine* v. *Kearny Township*, 23 *Vroom* 338, is cited to support the proposition that land cannot be condemned for a highway which is already a highway. This I shall not dispute. It is also said that as the court there decided that an " approach to a bridge " could not be secured by condemnation proceedings under a power to " regulate and open streets," that such power could not here be exercised. I do

not claim that it is. We do not propose to make an "approach" to a bridge over private property, not dedicated to public use as a street. We propose to change the grade of an existing street, and to carry that portion of the street which crosses the railroad over that railroad by elevating the street and depressing the railroad. A brief statement will, I think, show the inapplicability here of the case cited.

What the court decided in that case was, (1) that while there was a limited power to condemn given to Kearny township, the power of condemnation attempted to be used was for a purpose not specified in the legislative grant; (2) that an "approach to bridge," which was wholly across private property not in any way dedicated to public use, could not be acquired by condemnation, under an authority to open streets, because the "approach" was not a street, and because the condemnation set in motion to get the land for it was not attempted for the purpose of opening a street, aside from the bridge, nor for opening a street as an "approach to the bridge," but only to acquire an "approach," for which purpose no power to condemn had been granted. I do not see that this case is here in point.

II. Has the city power to change the grade?

The power to change a grade of a street is a continuous one and cannot be divested by contract. *Goszler* v. *Georgetown*, 6 *Wheat.* 593; 2 *Dill. Mun. Corp.*, § 685.

Our statute of 1858 is a recognition of the existence of this general power and a limitation upon its use in the cases here provided for. *Rev.*, tit. "*Roads*," §§ 70–75.

Hence the first inquiry here is, whether that act affects this case. I submit that it does not.

The city charter (section 76), passed in 1871, gives "exclusive control" over streets to the city. There could be no such thing as "control," absolute dominion, much less "exclusive control," if the city were obliged to obtain consent of owners, where buildings had been erected on streets, to change grade of those streets. There is then an utter incompatibility between the charter and the act of 1858, the effect of which

is to repeal the act of 1858, in so far as its operation in Camden is concerned, because of the later (1871) and inconsistent legislation.

The same result follows if we look at the act of 1874 (*Rev., tit. "Railroads,"* § 163), which gives to cities the power to change grades of streets to conform to contracts with railroad companies. The city may under that act " vacate,. alter the lines and change the grades of any street," in order to carry out such contracts.

This act is pertinent to this matter ; indeed, it gives express legislative sanction to the contract in this ordinance.

The constitutionality of this act has been .approved by this court in Vanderbeck *v.* Jersey City, decided in December;. 1887. (Not reported ; see opinion of Depue, J., on file with clerk of Supreme Court.)

In *Dodge* v. *Pennsylvania R. R. Co.,* 16 *Stew. Eq.* 351, this act passed unchallenged in any respect.

Here, again, we have a later legislative deliverance inconsistent and irreconcilable with the act of 1858. If it is urged that the act of 1874 applies only where railroads desire to " relocate, change or elevate" their. railroads, and that here none of these things are contemplated, I reply that it is the purpose here to "change" the present road-bed by depressing it "three feet at Second street" (ordinance, section 3). Such a depression from the existing grade would seem to be a radical "change," and any "change" whatever in the position of the road-bed is, as I claim, within the statutory provision, whether that "change" be accomplished by "elevation" or "depression." It is clearly within the spirit of the act, which is designed to "secure greater safety to persons and property," and the "change" may be effected in such a method "as in the judgment of such municipal authorities respectively may be best adapted to secure the safety of lives and property, and promote the interests of said cities respectively." Here it will be seen that a discretionary power as to the method of accomplishing the "change" is vested in the city, and hence any change which "in the judgment" of the city is "best

:adapted to secure the safety of lives and property," is such a
·"change" as the city may contract with the company to
make.

This act of 1858 requires a consent of a majority of owners
to any change of grade. How can this act be held to apply
here?

The Pennsylvania Railroad Company, as the lessee and suc-
·cessor of the Camden and Amboy Railroad and Transporta-
tion Company, is required "to construct and keep in repair
;good and sufficient bridges    *    *    *    over said railroad
where any public road crosses the same, so that passage of car-
.riages, horses and cattle on said roads shall not be prevented
thereby." *Pamph. L.* 1830, *p.* 83, § 15.

This provision in the charter of the railroad company im-
·poses upon it a public duty which is continuous and constantly
·changing as to the manner in which it is to be discharged,
in order that the ever-growing public demands for greater
·facilities for travel over the railroad along the public highways
·shall be met as they arise and increased safety in-crossing shall
be secured to the ever-increasing number of those who cross.
*In re Trenton Water Power Co., Spenc.* 659 ; *Morris Canal* v.
*State,* 4 *Zab.* 69, 70 ; *Central R. R. Co.* v. *State,* 3 *Vroom* 220 ;
*Newark* v. *Delaware, Lackawanna and Western R. R. Co.,* 15
*Stew. Eq.* 196 ; *Jersey City* v. *Central R. R. Co.,* 13 *Id.* 417 ;
*State* v. *St. Paul, &c., R. R. Co.,* 35 *Minn.* 131.

And so imperious is this duty that the railroad company
may itself change grades of streets to conform to its crossings,
:as was held in *Central R. R. Co.* v. *State, supra,* or it may
·change roads and obtain, by condemnation, land for that pur-
pose, "by necessary implication growing out of the duty to
make the change," as was held in *People* v. *Duchess, &c., R. R.
Co.,* 58 *N. Y.* 152. Under our General Railroad law (*Rev., p.*
931, § 109), similar powers are directly vested in companies
·organized under that act.

Is it not clear, then, that the act of 1858 was not designed
·to operate in a case like this? If it should be made opera-
·tive, the result would be that the many railroad corporations

of this state, now charged with this great public duty, the ob-- servance of which is essential to the security of the vast mul- titudes of travelers on our highways and on our railroads,. would not only be relieved of existing obligations,. but the duty itself would become impossible of performance.

The power of the city in this matter may be further illustrated by reference to charter, page 7, section 30, where the city is given power " to regulate highways, streets and bridges," as well as in page 8, of the same section, which gives council power to " grade    *    *    *    any street or high- way, or any section of such street, and prescribe the manner in which any such work shall be performed."

Here we have, under the power to " regulate bridges," a. recognition of the existence of the power to use bridges. If, then, there is a power to use bridges, there is also a power to provide them when and where the occasion for their use becomes apparent to the city council, as well as prescribe rules. under which existing bridges may be used.

The idea that the word " regulate " imports use is indicated in a number of New Jersey cases. In several of them it is dis- tinguished from " prohibition," notably so in *State* v. *Fay*, 15. *Vroom* 474, and *Paul* v. *Gloucester*, 21 *Id.* 585. Our courts have regarded the word " regulate " as importing a power to control, to restrict, to delimit. *Pell* v. *Newark*, 11 *Vroom* 75 ;. *Montgomery* v. *Trenton*, 7 *Id.* 79 ; *Tiger* v. *Morris*, 13 *Id.* 633 ; *Worthley* v. *Steen*, 14 *Id.* 544 ; *Traphagen* v. *Jersey City*,. 23 *Id.* 65.

Accepting this as the true legal significance of the word, how are we to escape the conclusion that the legislative purpose was, in giving a power to regulate, to confer by implication the power to create as well. A public corporation cannot " regulate " the use of something which does not exist ;. and if it has power to regulate a specific thing, can it not create the thing which, when created, it is its duty to " regulate ? "

By the next paragraph of the same. section, a power to " grade " and " prescribe the manner " in which it shall be

·done is given to council. It is already shown (*supra*) that the power to grade is a continuous one, of which the municipality cannot divest itself, nor by contract agree not to exer-·cise; that it is unlimited in its exercise except in so far as a fair discretion in the corporation may limit it, and that our :act of 1858 does not in any way affect or circumscribe it. This being so, then we have, under this section, an express ·delegation of power to " prescribe the manner " in which the ·grading may be done, which the counsel has the unlimited power to do. All grading is artificial and often arbitrary. It ·can only be accomplished by construction, or by change in natural conditions. How this change is to be best effected, is a question for the municipality as trustee of the public right of way. If it shall deem a bridge the best means of grading a street, then this sort of artificial structure, in preference to any other sort of artificial structure, is the " manner " prescribed by the city in the exercise of its power to grade. Having in the power to grade a power to establish the grade (*Hart* v. *West Orange*, 11 *Vroom* 122), and having, by this provision of the charter, power to " prescribe the manner " of ·grading, there can be no doubt that grading a street by a bridge is as clearly within the power of this municipality as would be grading by filling up with earth.

Another source of power is that drawn by implication from the power and duty to control streets, as will be seen by reference to the cases cited. See 19 *Iowa* 21, 199 ; 27 *Id.* 227 ; 29 *Id.* 73 ; 42 *Ill.* 169 ; 2 *Dill. Mun. Corp.*, § 728 (*supra*).

I contend, for the reasons and upon the authorities above ·cited, that the city of Camden has power to authorize this bridge to carry Second street over the Pennsylvania railroad, and thus secure greater safety in, and better facilities for, the ·crossing of that railroad, in and along that street, by the ·public.

III. But the power of the railroad company and its duty to build this bridge cannot be challenged. (See charter and ·cases cited *supra.*) When the railroad company contracts, as here it has, with the city of Camden, does not its power justify,

and its duty require, the construction of the bridge, under the act of 1874? *Rev., p.* 944, § 163. Will not the power of the railroad company supplement any deficiency of power in the city? It is the joint act of both, and the possession of power by either is enough.

IV. This is not a case where, by a special assessment, the burthen of building the bridge is cast upon abutters on the street. It is not a judicial act reviewable as such here. No burthen in any case is thrown upon prosecutor. She pays nothing as taxpayer or as abutter. She loses nothing, because nothing is taken from her which she presently possesses. We do not encroach upon her land outside the street line. We simply use that land as a public way in accordance with its dedication, in conformity with the power and duty of the city in the execution of its trust, and for the public benefit, as well as that of prosecutor.

The necessity is imperious. The present crossing is very dangerous; there are seven tracks on which engines and cars are lawfully passing to and fro in the operation of the railroad franchise and in the discharge of the duty, which, as the holder of that franchise, the railroad corporation owes to the state and its citizens.

The language of the learned Vice Chancellor who delivered the opinion in *Dodge* v. *Pennsylvania R. R. Co., supra,* is as pertinent a description of the situation presented in this case as it was to that in which it was used. I quote it (*p.* 362):

"The change which defendants propose to make   *   *   *  is one in which the public have a very deep interest. It will make travel both on the railroad and the highways   *   *   *  more expeditious than it is at present, and it will give greater security to human life by removing danger which now exists, and which imperil it, to a greater or less extent, every day in the year. That the change is proper and necessary, to the end that life and property may be made more secure, and to promote the best interests of Jersey City, is a question which has been finally concluded by the judgment of that municipal body to which the legislature thought proper to submit it."

These reasons were regarded by the Vice Chancellor as of themselves sufficient to justify a refusal of an injunction in that case, and this court affirmed that refusal " for the reasons given " by the Vice Chancellor.   18 *Stew. Eq.* 366.

The case at bar is, for the reasons given, easily distinguishable from *Stretch* v. *Hoboken*, 18 *Vroom* 268.

Besides, this ordinance is an exercise by the city of its admitted discretionary power, which this court will not interfere with.   *State* v. *Freeholders*, 3 *Zab.* 214 ; *Plum* v. *Morris Canal*, 2 *Stockt.* 260 ; *Stoudinger* v. *Newark*, 1 *Stew. Eq.* 189 ; *McKinley* v. *Freeholders*, 2 *Id.* 169 ; *Whitall* v. *Freeholders*, 11 *Vroom* 302 ; *Milhau* v. *Sharp*, 17 *Barb.* 435.

It is, however, claimed by prosecutor that as the grantee of a right to use the streets upon which she abuts, dedicated to public use by Sharp's map, she has a private right of way, distinct from the public, in the lands over which those streets are laid.   This question was suggested in *State* v. *Snedeker*, 1 *Vroom* 80, by Justice Vredenburgh, who referred to it as a question which might, in the future, arise.   In *Booraem* v. *North Hudson Co. Ry.*, 13 *Stew. Eq.* 557, Justice Depue recognizes, as existing in an abutter as against his grantor, an easement of way in the lands of grantor, which the grantor has by dedication offered to the public use.   The easement, as was said in that case, " precedes the public right, and is the source from which the public right springs.   By such conveyances the grantees are regarded as purchasers by implied covenant of the right to the use of the street as a means of passage to and from their premises as appurtenant to the premises granted, and this private right of way in the grantee is wholly distinct from, and independent of, the right of passage to be acquired by the public."

The learned justice who delivered this opinion did not, however, decide whether, after acceptance by the public of the proffered use as a public way of the land over which, before such acceptance, the abutter had a " right of passage," such acceptance by the public " merged " such right or left it " merely suspended."   Whatever view may be taken of these

judicial expressions, when we consider that the only point in the case was the interpretation of a grant of a way, it is clear that the court did not decide that this "right of passage" was either "merged in" or "suspended" during the exercise of the public right after the dedicated lands were accepted. Upon this question the opinions of courts vary. It seems to me, however, that the correct and rational view is that they merge, and for these reasons :

The owner who offers his land by dedication for public use, by plotting streets over it and selling lots abutting on those streets, has parted with all beneficial ownership of every part in the lands so offered. *Booraem* v. *North Hudson Co. Ry.*, 13 *Stew. Eq.* 565. He has offered them to the state as trustee for the people, for the use of all who may have occasion to pass over them. Until the acceptance by the state of the trust tendered, he has impliedly, by his offer, contracted with his abutting grantees that they shall have passage over them as a private right appurtenant to their lands. These grantees have accepted this right of passage under the implied grant, to be used by them as a private right until the state has, by acceptance of the way, assumed the burden and duty of maintaining it for their use in common with all others. The effect of the contract between the owner and his abutting grantees is, that the grantees shall enjoy the way at once, as it is at the time of the grant, as a private right resting in contract, and, on their part, that, when the way is accepted by the state for maintenance as a public charge, they will take, in view of the improvement and maintenance of the way at the public expense and the benefits which they, in common with others, receive therefrom, the right of passage, which has never been disturbed as a part of the public at large, enjoying it freely as others do, with the additional advantage of the increased value which the maintenance by the public treasury of a public highway on which they abut gives to them as a way not only over the lands of their grantor, which is all they could claim by their grant, but over the lands of all other persons which lie within the public way throughout its entire extent, which they get by

the public acceptance only. They, in consideration of these things, surrender their private rights, which " precede the public right, and are the source from which the public right springs " to the public. The result is, that the position of an abutter on a public way, before acceptance, is precisely that of the owner of the land who dedicated it. Each has agreed that the public may take and maintain it, and each gets the benefit of the way, after its acceptance by the public, relieved of all the burden of maintenance which, but for that acceptance, would have been cast upon themselves.

The authorities which sustain this position are *Washb. Easem.* (*4th ed.*) 225 ; *Bailey* v. *Culver*, 84 *Mo.* 531 ; *Mercer* v. *Pittsburg, &c., R. R. Co.*, 36 *Pa. St.* 99.

Again, if there be a private right of way, or a private right of passage over a public way, how is it to be enjoyed ? It cannot be enjoyed as a private right in common with the rights of the entire public. The essence of enjoyment of private rights of every character is exclusive of others from that enjoyment. A thing ceases to be a private right when its enjoyment is open to all. How can the private right exist while it is insusceptible of private enjoyment? It must necessarily, as it seems to me, lose every quality of a private right of property when it cannot be enjoyed as such. Can the abutter, because of this so-called private right, exclude any other person from the use of the public way in which the abutter claims the private right? To permit a private individual to hold title or regulate the mode in which the public use shall be exercised, is entirely inconsistent with a public use. After a dedication, the owners of the fee cannot authorize its use for any private purpose. *Trustees* v. *Hoboken*, 4 *Vroom* 13, 19, 20.

It seems to me that the law cannot recognize, as outstanding, a mere private right, resting in contract, to a passage over and an independent use of a public way.

Upon the whole case, I respectfully submit that the judgment of the Supreme Court should be affirmed.

The opinion of the court was delivered by

Dixon, J.   Bridge avenue, in the city of Camden, was one hundred feet wide, running from the Delaware river eastwardly, and through it were laid the tracks of the Pennsylvania Railroad Company.   Second street, sixty-six feet wide, crosses it at about right angles.   The plaintiff in error owns land fronting on the west side of Second street, south of Bridge avenue.

On September 26th, 1889, the city council of Camden passed an ordinance with these provisions: That a strip sixty feet wide on the north side of Bridge avenue, extending from Fourth street westerly across Second street to the river, should be vacated; that Second street for some distance north of Bridge avenue should be vacated; that the Pennsylvania Railroad Company should remove its tracks, which were on Bridge avenue west of Fourth street, to the said strip of sixty feet on which the common highway was vacated, and should construct, in the westerly half of Second street, an iron bridge over its tracks, with the necessary approaches, extending north over the vacated portion of Second street and south along the westerly half of Second street to a point beyond the plaintiff's land; and that at the junction of Bridge avenue and Second street the tracks should be depressed three feet, so as to leave a clear space of twenty feet in height between the rails and the bridge.   It provided also for securing the payment of the whole expense by the railroad company, and was not to take effect until the company should execute an agreement with the city to comply with its terms.

The plaintiff in error obtained a writ of *certiorari* to review this ordinance and the proceedings taken under it, and the Supreme Court having affirmed them, she now prosecutes this writ of error.

The first question for decision arises on the claim of the defendants that the plaintiff has no *locum standi* to maintain a writ for the purpose of setting aside the proceedings. Clearly she has, because the ordinance provides for the erection of an embankment in front of her private property, upon

a part of Second street, of which the fee belongs to her.    She is entitled to question the right of the city to use that land in the manner proposed.    It may be that there are provisions in this ordinance which, if they stood alone, she would not be permitted to impugn for lack of private interest, but as the ordinance has only a single object, to the attainment of which each of its provisions is designed to contribute, and which is set up as the sole justification for the embankment on her property, she becomes entitled to have the entire scheme reviewed.

The chief objections made on behalf of the plaintiff to the proceedings under review, rest upon a denial of the power of the city council in the premises.    It is denied that the council can vacate Bridge avenue or Second street, because they are dedicated streets and not streets laid out by formal municipal procedure; it is denied that the council can vacate part of a street longitudinally, so as to make it narrower, as is done in the case of Bridge avenue; and it is denied that the council can change the grade of Second street, which has been built upon, without " the consent of a majority of owners in interest of the lots fronting on the part proposed to be altered," according to section 72 of the Road act.    *Rev., p.* 1009.

But we think all of these denials are fully answered by the statute of March 19th, 1874 (*Rev., p.* 944), which enacts " that the proper municipal authorities of any city of this state be and they are hereby authorized and empowered to enter into such contracts with any of the railroad companies, whose roads enter their cities, respectively, to secure greater safety to persons and property therein, whereby the said railroad companies may relocate, change or elevate their railroads within said cities, or either of them, as in the judgment of such municipal authorities, respectively, may be best adapted to secure the safety of lives and property and promote the interests of said cities, respectively, and for that purpose shall have power to vacate, alter the lines and change the grades of any streets or highways therein, and to do all such acts as may

be necessary and proper to effectually carry out such contracts."

The avowed object of this statute is highly beneficent, and, therefore, its provisions tending towards the accomplishment of that object should be liberally construed. Under such a construction, the delegation of power " to vacate any street " plainly cannot be confined to those streets which originated in some particular mode, and we think it includes any part of a street, either transverse or longitudinal, when the vacation of such part aids in attaining the desired result. So, the power of changing grades is given in terms which do not admit of the idea that its exercise was to be dependent on the consent of abutting owners ; to that extent this statute, in order to carry out its purpose, supersedes section 73 of the Road act. The authority of the council appears to be ample.

But the plaintiff insists that the work to be done on Second street is not a " change of grade " upon the street, because the bridge to be built cannot be deemed a part of the street, and also because the bridge and its approaches are to occupy only one-half of the width of the street.

This contention is not valid. A street is only an improved public way through a town or city, and whether the way rests immediately upon the solid ground or is supported above it, like a bridge, it may still be called a street. No doubt the legislature may use the terms " street," " road " and " highway " in a sense which excludes bridges in their route, but, since, in the act of 1874, the power to change the grades of streets and highways was evidently conferred in order that travel thereon might pass over or under intersecting railroads, the legislature must have intended to include bridges as a part of the streets and highways at their new grade. Nor is there anything illegal in the establishment of different grades for different longitudinal sections of a street. Sidewalks and carriage-ways are common instances of such different grades. When, as here, there may be sufficient reason for greater divergence, that is not illegal. It was within the discretion of the

council to determine whether the embankment and bridge should occupy the whole width of the street or not.

It is further insisted that this ordinance goes beyond the power of council, in that it purports to "authorize, empower and direct" the railroad company to move its tracks to that part of Bridge avenue which is vacated, the plaintiff contending that, under her deeds which grant "the free use of all the public streets and alleys as laid out in the town plot of Camden," she has private rights in that portion of Bridge avenue which are not subject to the disposition of the council.

If this ordinance should be interpreted as an actual grant to the company of the right to place and maintain its tracks on the land indicated, then this private claim of the plaintiff would call for investigation; but it should not be so interpreted. By the vacation of the street the council terminated all public rights and duties therein, and, of course, could not confer upon the company any power or authority over the same. As against private interests in the land, the company must establish its rights on some other basis than this ordinance. Whether it has such rights cannot be determined on the testimony now before us.

The clause of the ordinance alluded to is evidently intended to be only a direction to the company to remove its tracks from the remaining forty feet of the avenue, and to make such removal one of the terms of the arrangement which the ordinance is designed to carry out.

But there is one provision of this ordinance which is inconsistent with and, if effectuated, defeats the main object in view. This is the clause vacating Second street for some distance north of Bridge avenue. On this part of Second street a large section of the northerly approach to the bridge must rest, and, consequently, by the surrender of all the public rights therein, the council deprives the public of the right to use this approach, and thus destroys the public utility of the entire structure.

The purpose of this vacation we have not been able to discover; but, so far as we can see, its effect is to render the whole enterprise abortive, as an effort to subserve public interests.

Instead of being a reasonable means of conducting public travel through Second street over the railroad above the risk of collision with trains, the embankment of which the plaintiff complains becomes, under this provision of the ordinance, only an approach to a small patch of private land where the traveler may be compelled by the owner to turn back and retrace his steps to the former level of the street.

Because of this feature of the ordinance, we think the scheme is unreasonable, and therefore the ordinance and all proceedings under it should be set aside.

Let the judgment of the Supreme Court be reversed.

*For affirmance*—None.

*For reversal*—THE CHANCELLOR, CHIEF JUSTICE, DIXON, GARRISON, MAGIE, REED, VAN SYCKEL, WERTS, BOGERT, BROWN, CLEMENT, KRUEGER, SMITH, WHITAKER.    14.