64  587
65  309

THE MORRIS AND CUMMINGS DREDGING COMPANY, DEFENDANT IN ERROR, v. THE MAYOR AND ALDERMEN OF JERSEY CITY, AND THE GREENVILLE AND HUDSON RAILWAY COMPANY, PLAINTIFFS IN ERROR.

Argued March 28, 1900—Decided June 18, 1900.

1. When the Supreme Court on legitimate evidence decides that the lands of an individual will be depreciated in value by contemplated municipal proceedings, and thereupon holds him entitled to prosecute a writ of *certiorori* to test the legality of those proceedings, such decision is not reviewable in this court.

2. Railroads that lie wholly within a city are embraced in the true intent and force of the title and body of the act of March 19th, 1874 (*Pamph. L.,* p. 45), as railroads which *enter* a city.

3. Under said act a city may, by resolution, contract to do that which it will require an ordinance to execute legally.

4. Under said act a city may, by resolution, contract to change the grade of an existing street and to accept the dedication of a new street, in order to enable a railroad company to lay yard tracks beneath the new grade.

5. Under said act a railroad company may contract to change the location of its original route.

6. When municipal proceedings have been brought under review by *certiorari*, objections thereto, which are not pointed out by the reasons filed, should not be considered.

On error to the Supreme Court.   For opinion of the Supreme Court, see *ante p.* 142.

For the defendant in error, *Lindley M. Garrison.*

For Jersey City, *Allan L. McDermott.*

For the Greenville and Hudson Railway Company, *Charles L. Corbin.*

The opinion of the court was delivered by

DIXON, J.   Certain resolutions passed by the board of street and water commissioners of Jersey City, on October 19th, 1898, relating to Chapel avenue, were removed to the Supreme Court by writ of *certiorari* prosecuted by the Morris and Cummings Dredging Company, and were set aside by that court, whose judgment is now brought here for review.

The first question is whether the company had such an interest as entitled it to prosecute the *certiorari*.

The proceedings of the board did not contemplate any direct interference with the lands of the company, or any change in the avenue where those lands abutted upon it, but the result of carrying out the proceedings might be deemed to have an injurious effect upon the value of the lands by lessening the convenience of access to them.   They were clearly so situated with regard to that portion of Chapel avenue which was to be altered in pursuance of the resolu-

tions of the board, that under appropriate legislation those lands might be subjected to assessment for special benefit, or their owner might be entitled to compensation for special damage, resulting from alterations there made.

Whether the alterations intended would really have an injurious effect upon the value of the company's lands, was a question of fact presented to the Supreme Court in allowing and in rendering final judgment upon the writ of *certiorari,* and the decision of that court upon the question is not subject to review here. *Moran* v. *Jersey City,* 29 *Vroom* 653; *Morris* v. *Bayonne,* 33 *Id.* 385; *Delaware, Lackawanna and Western Railroad Co.* v. *Newark,* 34 *Id.* 310. Assuming the fact to be as there found, the company evidently had such special interest, different in kind from the interest of the public, as entitled it to maintain the *certiorari.*

The proceedings of the board rest upon the act of March 19th, 1874 (*Pamph. L., p.* 45), as amended March 9th, 1893 (*Gen. Stat., p.* 2689, ¶ 221). The title of the act is "An act to authorize any city of this state to enter into contracts with railroad companies whose roads enter their corporate limits, whereby said companies may re-locate, change or elevate their railroads, and, where necessary for that purpose, to vacate, change the grade of or alter the lines of any streets or highways therein." The body of the amended act makes its provisions applicable to railroad companies whose roads "enter or lie within" any city.

The Supreme Court held, according to our settled law, that under the constitution the operation of a statute is limited to the object expressed in its title, and therefore that even under the amended act railroads which did not "enter" a city were not within the constitutional operation of the law. The court further decided that railroads do not "enter" a city, within the purview of this act, unless their lines cross the border of the city, so as to be partly outside and partly inside the city. Since the road of the Greenville and Hudson Railway Company, with whom the resolutions under review were intended to contract, lies wholly within Jersey City, the court con-

cluded that the statute was not applicable to the proceedings, and therefore set them aside.

In this interpretation of the word "enter," as used in the title of this act, we do not concur.

Although the words of a statute are to have a controlling force in its construction, yet each word should be so interpreted as to subserve the legislative intention which all the words disclose. The manifest purpose of this statute, as indicated both by its title and by its enactments, is to afford relief against the dangers incident to the intersection of streets and railroads in the cities of the state. Such dangers exist equally whether the railroad lies wholly or but partly within the city. Although the letter of the act deals only with railroads that *enter* a city, yet the subject of legislation is not the *entrance* of the railroad, but its *presence* in the city. If we stick closely to the letter of the law, we may say that a railroad does not *enter* a city, unless its construction be commenced outside and continued into the city ; but if the construction of the railroad began within the city and extended beyond its border, or began within and ended within the limits of the city, or was fully completed before the city had an existence, the need and propriety of this legislation would be the same.

As was said in *Read* v. *Camden*, 25 *Vroom* 347, 373, " the avowed object of this statute is highly beneficent, and therefore its provisions tending towards the accomplishment of that object should be liberally construed ; " and especially is liberality of construction to be adopted when the question is whether the title of a statute is so restrictive as to defeat the body of the law. *Johnson* v. *Asbury Park*, 31 *Id.* 427, 431.

As early as Queen Elizabeth's time it was unanimously resolved by the barons of the exchequer that with regard to remedial statutes " the office of the judges is always to make such construction as shall suppress the mischief and advance the remedy, and to suppress subtle inventions and evasions for the continuance of the mischief, and *pro privato commodo*, and to add force and life to the cure and remedy, according

to the true intent of the makers of the act, *pro bono publico."* *Heydon's Case*, 3 *Rep.* 7 ; *Magdalen College Case*, 11 *Id.* 66.

In accordance with this sense of judicial duty, courts are sometimes constrained to give to particular words in a statute a force not quite justified by their ordinary meaning, but so clearly necessary to carry out the design of the legislature as to render it certain that, if the inaptness of the particular word had been noticed, a broader form of expression would have been substituted for it. Without going beyond our own reports, the case of *Weimar* v. *Fath,* 14 *Vroom* 1, may be cited as an example. There the statute, which provides that, when lands are *ordered* to be sold by the executors named in a will, and one or more of the executors die or fail to prove the will, the surviving or acting executor may sell the land, was construed to cover a case where the will did not *order* that the land be sold, but only *authorized* the executors to sell. See, also, *Den* v. *Robinson,* 2 *South.* 689, and *Randolph* v. *Larned,* 12 *C. E. Gr.* 557.

The effect of the proper exercise of this judicial function is not to extend the law beyond the purpose of the legislature, but to fulfill that purpose, when ascertained, notwithstanding the inappropriateness of some of the terms employed.

Under this canon of construction we think it reasonable to hold that railroads which are located in a city, *enter* the city, within the scope of the title to these acts, even though they do not extend beyond the city limits. The amendment of 1893 merely expressed, in unmistakable form, a meaning which would have been gathered from the substance of the original act.

We must therefore consider whether the more special reasons filed by the prosecutor for overturning these proceedings should be sustained.

Chapel avenue, running in a southeasterly direction, crosses the tracks of the New Jersey Central Railroad Company on a bridge sufficiently high to permit the passage of trains beneath ; then with an irregular descent of seventeen and a half feet for three hundred and sixty-three feet of length it

reaches the Morris canal which it crosses on a low bridge, and at once comes to the tracks of the National Docks Railway Company; after crossing these at grade, it passes through the lands of the prosecutor and continues to New York bay. Between the canal and the Central railroad the land is all owned by the Geenville and Hudson Railway Company, the contracting company in these proceedings, and although Chapel avenue is theoretically fifty feet wide, yet over this land it actually consists of an unpaved, ungraded road only sixteen or seventeen feet in width leading to a still narrower passage over the canal.   On this land the contracting company has its located route and proposes to lay tracks at right angles to the avenue.

The change now projected is the construction of an iron or steel viaduct, seventeen feet wide in the clear, extending southeasterly from the bridge over the Central railroad, for about two hundred and eighty feet within the lines of the avenue.   Of this distance, one hundred and seventy feet will be nearly level, and the rest will have a slope of about five and one-half per cent.   Thence an earth embankment is to be made, forming a roadway twenty-five feet wide, the centre line of which will leave the centre line of the avenue, curving almost to a right angle, and after running southwesterly about one hundred and fifty feet, will turn sharply toward the southeast and northeast, and rejoin the centre line of the avenue about forty-five feet from the point of departure. This loop is required to provide a reasonable grade from the southeasterly end of the viaduct to the northwesterly end of the canal bridge, and will have a gradual inclination of about five per cent.   The land occupied by it will be dedicated by the contracting company for public use as a highway.

In this scheme there is nothing to be done by the city that is not clearly within the power conferred by the act of 1874. The statute empowers the proper municipal authorities to enter into such contracts with the railroad company as " shall secure greater safety to persons and property therein, or facilitate the construction and maintenance of other than grade

crossings of streets, highways or other railroads therein," and for that purpose they "shall have power to open, vacate, alter the lines and change the grades of any streets or highways or any part thereof" within the city.

The present contract involves, on the part of the municipal authorities, only a change of grade for that part of Chapel avenue which is to be occupied by the projected viaduct and embankment, and the acceptance of the new highway over the projected loop. In carrying out its part of the contract, the city must act in conformity with its charter and the laws amending the same.    *Clark* v. *Elizabeth,* 32 *Vroom* 565.

With respect to the change of grade and the construction of the avenue at the new grade, the resolutions now before us seem to be all that the law requires. As this part of Chapel avenue has never been graded and no buildings have been erected or commenced thereon, the proper procedure is prescribed by sections 56 and 57 of the charter (*Pamph. L.* 1871, *p.* 1094), and chapter 134 of the acts of 1891. In exact .conformity with those laws, the board of street and water commissioners proceeded in passing these resolutions. In view of the fact that the contracting company was to bear all the expense of grading the avenue and was the owner of all the abutting property, the same proceedings sufficed for the doing of the work under section 48 of the city charter.

Whether by mere resolution the acceptance of the new highway can be legally effected is certainly questionable, in view of the act of March 5th, 1896 (*Pamph. L., p.* 42), and it may be that the fifth resolution before us is inadequate as a mode of regulating the crossing of the avenue by the tracks of the railroad.    *Pamph. L.* 1891, *p.* 249, § 12.    But these statutes do not impair the right of the city to contract under the act of 1874.    They relate rather to the manner in which the city shall perform its contract, and hence they are not now necessarily pertinent.    Besides, none of the reasons filed points to the need of ordinances, instead of resolutions, respecting the matters just mentioned.    On the same ground, the claim put forth in argument, that the prosecutor is enti-

tled to compensation for the damage done to its property, must be disregarded.

By the second, fifth and sixth reasons filed, the prosecutor complains that these resolutions enable the contracting company to effect a new location of its original route, to construct its railroad outside the limits of its legal route as now on file and to lay yard tracks as distinct from a railroad.

The resolutions do not express these purposes, but the evidence indicates their existence. In them, however, we see nothing illegal. The statute of 1874 clearly provides for the location, re-location and change of railroads in such manner as may be best adapted to secure the safety of lives and property and to obtain other than grade crossings of streets and railroads. It certainly needs no forced interpretation of words to find in this language sanction for a new location of the original route of a railway and for the avoidance of grade crossings over tracks which are placed in railroad yards. What other steps are required of the contracting company to legalize its change of route does not now concern us. Nor need we determine whether the company has power to lay tracks in this space outside of its defined route, for the contemplated changes in the avenue would be equally justified if tracks within that route only were to be crossed above grade.

None of the objections urged against these proceedings appears to have legal support, and therefore the judgment of the Supreme Court setting them aside should be reversed and a judgment affirming the proceedings should be entered.

*For affirmance*—None.

*For reversal*—MAGIE (CHANCELLOR), DIXON, GARRISON, LIPPINCOTT, LUDLOW, COLLINS, BOGERT, HENDRICKSON, ADAMS, VREDENBURGH, VOORHEES.   11.